UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRENDA BOND, individually, on behalf of all wrongful death beneficiaries, and on behalf of the ESTATE OF BART J. BOND, deceased,<br><br>Plaintiff,<br><br>v.<br><br>COMAL COUNTY, CORRHEALTH, PROFESSIONAL LIMITED LIABILITY COMPANY a/k/a CORRHEALTH LLC a/k/a CORRHEALTH, LLC, and RANDALL MOON,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>5:26-cv-916 |

## PLAINTIFF'S COMPLAINT

Plaintiff Brenda Bond brings this 42 U.S.C. § 1983, Americans with Disabilities Act, Rehabilitation Act, and state law lawsuit against Defendants Comal County, CorrHealth, Professional Limited Liability Company a/k/a CorrHealth LLC a/k/a CorrHealth, LLC, and Randall Moon, because their deliberate indifference, discrimination, and medical mistreatment caused the senseless and painful death of Plaintiff's son, Bart J. Bond.

### I.    PARTIES

#### A.  Plaintiff

1.      Brenda Bond is the natural mother of the deceased, Bart Joseph Bond. Ms. Bond resides in Comal County, Texas.

2.      Ms. Bond brings her claims under the Texas Survival Statute as the representative of Bart's estate, and under the Texas Wrongful Death Act on behalf of herself as sole wrongful death beneficiary.

3.      Bart had no surviving spouse, no surviving children, and died intestate. No administration of his estate is pending and none is necessary.

**B.  Defendants**

4.      Defendant Comal County, Texas, is a political subdivision of the State of Texas. The County owns and operates the Comal County Jail, ("the jail"); employs and compensates the staff of the jail; supervises contract workers at the jail; and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law. The County is a recipient of federal funds. Comal County may be served with process through the acting or interim county judge, at the Office of the Comal County Judge, 110 Main Plaza New Braunfels, Texas 78130, or wherever they may be found. **Service is requested at this time.**

5.      CorrHealth, Professional Limited Liability Company, a/k/a CorrHealth, LLC a/k/a CorrHealth LLC (hereinafter "CorrHealth") is a domestic professional limited liability company doing business in Texas. CorrHealth employed medical providers responsible for the medical needs of detainees and inmates at the Comal County Jail at all relevant times. CorrHealth is a recipient of federal funds. CorrHealth may be served with process through its registered agent for service, Michael T. Murphy, at 6303 Goliad Avenue, Dallas, Texas 75214, or wherever he may be found. **Service is requested at this time.**

6.      Randall Moon is an advanced practice registered nurse ("APRN") practicing in Texas. Mr. Moon is sued in his individual, personal capacity. At all relevant times, Mr. Moon acted under color of law. At all relevant times, APRN Moon was acting in the scope and course of his employment by CorrHealth. APRN Moon can be served at 2060 S. Colorado St., Lockhart, Texas 78644 or wherever he may be found. **Service is requested at this time.**

2

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over Plaintiff's federal question claims brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to 28 U.S.C. § 1331 and § 1343. The Court has supplemental jurisdiction over the state law claims, which arise from the same case and controversy pursuant to 28 U.S.C. § 1367. Thus, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3).

8.    The Court has personal jurisdiction over the Defendants as they reside in or do business in the Western District of Texas and in this Division.

9.    As all relevant events occurred within the Western District of Texas at Comal County Jail, which is in this Division, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

10.    Further, although Defendant Comal County is a governmental unit in the State of Texas, Defendant has waived its immunity as to Plaintiff's state law claims and is subject to the jurisdiction of this Court because Plaintiff's injuries were caused by the misuse of tangible personal property within the exclusive control of Defendant, by and through its staff, agents, servants, and employees

## III.    NOTICE OF STATE LAW CLAIMS

11.    Plaintiff provided notice to Defendants of the state law claims made the subject of this action in accordance with any applicable state law notice requirements. Plaintiff agrees to provide evidence of such notice if the Judge of this Court so requires. Plaintiff satisfied any other conditions precedent for this suit. Furthermore, Plaintiff's claim was obvious and actually known to those with responsibility for assessing the risk of Defendants within six months or less of the

3

injury at issue as Bart Bond died in the Comal County Jail as a result of the conduct described herein.

## IV.    FACTS

### A.  Defendants caused Bart to suffer agonizing pain and die in the Comal County Jail.

12.    Brenda Bond's son, Bart Bond, was diagnosed with autism at age seven. Autism is a developmental disability affecting how a person communicates, interacts with others, and experiences the world. This diagnosis caused Bart to be a person with a disability, as his autism impaired his ability to think, care for himself, perceive reality, work, control his impulses, and communicate, as well as impairing the function of his brain.

13.    Bart was also diagnosed with schizophrenia, a mental illness that included symptoms of recurrent psychosis and required treatment with anti-psychotic medication. His schizophrenia was also a disability that independently impaired his ability to think, care for himself, perceive reality, work, control his impulses, and communicate, as well as impairing the function of his brain.

14.    Bart's kidneys were also damaged to the point where he had been diagnosed with nephrotic syndrome. Bart's kidney damage and nephrotic syndrome were disabilities that impaired his ability to urinate and impaired the normal function of his renal system.

15.    During his childhood, Bart required special education and accommodations as a result of his autism and mental illness. As an adult, his disability impaired his ability to maintain regular employment and his ability to live independently, so he lived with his mother and father until his father's death.

16.    When his father died, Bart struggled with frustration intolerance and was unable to cope and process the extent of his grief and loss. When an autistic person becomes overstimulated or unable to cope with their environment, they can experience an intense response, or "meltdown."

4

These episodes are involuntary reactions to sensory, emotional, or cognitive overload. During a meltdown, a person may not be able to control their behavior and experience intense distress. They differ from tantrums, which are typically goal-oriented behaviors. Physical behaviors such as hitting, kicking, or head-banging may occur, though these are not intentionally aggressive but rather responses to overwhelming distress.

17.    During an autism meltdown in August of 2023, Bart physically acted out and threw a cellphone in his mother's direction while his sister was nearby. Realizing that she needed help to safely manage Bart's symptoms, particularly due to her daughter's proximity, Brenda called 911 seeking a civil emergency detention. Instead of receiving the help Brenda hoped and prayed he would get, Bart was arrested and detained at the Comal County Jail.

18.    Shortly after Bart arrived at the Comal County Jail, the Jail's detention officers ran the mandatory continuity-of-care query (CCQ) on him which identified that he had received services because of his developmental disability from one of the Texas local intellectual and developmental disability centers or LIDDAs, informing them that his developmental disability severely limited his mental and communication abilities.

19.    The jail also knew Bart had been diagnosed with schizophrenia from a previous detention in the jail during which he engaged in significant self-harm, leaving scarring on his forehead that was still visible when he was re-admitted to the jail in 2023, informing all County staff of Bart's limited mental abilities.

20.    Accordingly, because of his disabilities, Comal County confined Bart in a cell in the mental health ward of the jail.

21.    At all relevant times, CorrHealth was the private entity that contracted with Comal County to provide medical and behavioral healthcare to detainees in the jail and also employed or contracted with APRN Moon.

22.    Defendants CorrHealth and APRN Moon also knew that Bart had autism and a mental illness, so they knew he needed accomodations as a consequence of those diabilities. The results of the CCQ were saved in his medical file and both autism and schizophrenia were included within the list of his medical diagnoses.

23.    Likewise, while Bart was in jail, CorrHealth and APRN Moon diagnosed Bart with nephrotic syndrome and knew of this disability as well as the limitations it placed on him.

24.    Each Defendant actually knew of each of Bart's disabilities, knew his autism and mental illness impaired his ability to communicate, knew each of his three disabilities impaired his ability to care for himself,  knew his mental illness impaired his perception of reality, knew his disabilities increased his risk of self-destructive behaviors, and knew his autism and mental illness affected his ability to make informed decisions about his medical care.

25.    While awaiting trial, Bart began experiencing clear signs and symptoms of venous thromboembolism ("VTE") or serious blood clots, which—if left untreated—can be fatal, as all Defendants knew. VTE is a known and substantial risk for incarcerated people. In fact, incarceration is widely known to be associated with a *tripled* risk of VTE death compared to the free population.[1] This increased risk of death is most likely due to restricted mobility inherent in the structure of most carceral settings.

---

[1] *See, e.g.* Valenzuela, L. et al., *Impacts of the carceral environment on autopsy-verified venous thromboembolism mortality*, 20 Thrombosis Update 100221 (ScienceDirect Sep. 2025) ISSN 2666-5727, *available at* https://www.sciencedirect.com/science/article/pii/S2666572725000240.

26.    In addition to the risk posed by incarceration, Bart's medical conditions, including his disabilities, substantially increased his personal risk of suffering VTE. He was overweight, he needed to take antipsychotic medications to mitigate the impairments caused by his schizophrenia, he suffered high blood pressure, and he had a diagnosis of nephrotic syndrome. Each of these factors is associated with significant elevated risks of VTE events.

27.    Defendants CorrHealth and APRN Moon not only knew about each of these risk factors as they were documented in Bart's medical records, but they also knew that these risk factors were a result of Bart's disabilities.

28.    CorrHealth and APRN Moon knew that Bart was overweight, in part, as a result of the anti-psychotic medication they prescribed to him to treat his mental illness. CorrHealth and APRN Moon likewise knew Bart had high blood pressure and nephrotic syndrome as they had prescribed medications or treatments for both.

29.    CorrHealth's employees and agents, including but not limited to APRN Moon, actually subjectively knew that each of these additional risk factors meant that Bart was at substantial risk for suffering from a VTE.

30.    Yet despite knowing of these risk factors and the substantial risk to Bart that he would suffer a VTE, neither APRN Moon nor any other CorrHealth employee did anything to monitor Bart for his increased risk of VTE.

31.    On February 11, 2024, Bart requested medical treatment from the Comal County jail and CorrHealth providers. Bart reported that "**My lungs are sore, they hurt when I breathe** on the right side of my ribs."

32.    In the early morning of February 12, 2024, CorrHealth RN Candace Dockery took Bart's vitals and found that his pulse was elevated at 122 beats per minute (tachycardic), his

respiratory rate was 20 (tachypneic), his oxygen saturation rate was 91% (low) and he was wheezing on exam. He had no fever. He tested negative for Covid. These findings of tachycardia, tachypnea, decreased oxygen saturation, wheezing, negative Covid test with no fever, and rapid onset "lung" pain are hallmark symptoms of a pulmonary embolism ("PE"), which is a blood clot that breaks off and travels through the vessels to the lungs. A PE is a type of VTE.

33.    Treatment of a PE focuses on keeping the blood clot from getting bigger and preventing new clots from forming. Prompt treatment is essential to prevent death.

34.    On information and belief, CorrHealth Nurse Dockery recognized that Bart was exhibiting classic signs of a PE and knew that, as a first step, the standard of care for a PE requires an assessment by a physician or APRN who can then order imaging necessary to confirm or rule out a PE and obtain necessary treatment.

35.    CorrHealth Nurse Dockery also knew that a PE is a life-threatening condition that can become deadly in minutes.

36.    Despite knowing that she needed to have Bart immediately seen by a physician or APRN and that she risked Bart's life and health if she did not, CorrHealth Nurse Dockery instead intentionally treated him incorrectly by giving him only Albuterol and Tylenol and sending him back to his cell until he could be seen by a physician or APRN on dayshift hours later.

37.    At the time CorrHealth provided the medical care for the detainees at the Comal County jail, it proudly asserted on its website (for Comal County policymakers to see) that it had a policy of minimizing off-site transports for detainees who needed medical care because this saved money.

38.    In practice, this policy worked to outright deny off-site transport of Comal County jail detainees who needed higher levels of medical care than could be provided in the jail, including emergency medical care.

8

39.     CorrHealth likewise had a policy or practice, specifically designed to minimize costs, of not staffing the jail's medical clinic with any physicians, APRNs, or anyone else with authority to send a detainee off-site for necessary medical care at night. Instead, detainees had to wait until they were seen by someone on dayshift to even be evaluated for off-site care which was routinely also denied.

40.     On information and belief, the Sheriff of Comal County as well as Comal County's other policymakers including its County Judge and commissioners were aware of CorrHealth's policy or practice of denying jail detainees off-site transports for medically necessary care in order to save money both because it was front and center on CorrHealth's website and promotional materials and because it was one of the reasons they selected CorrHealth as the jail's medical provider.

41.     Likewise, the Sheriff, County Judge, and commissioners of Comal County knew that CorrHealth had a policy or practice of cutting costs by not staffing the jail overnight with a physician, APRN, or any other person who had the ability or authority to send someone off-site for medical care overnight, resulting in detainees waiting hours to even be evaluated for off-site medical care which was still routinely denied.

42.     Later that same day, Bart submitted another urgent request for medical treatment to the Comal County jail, stating: "My lungs hurt on the right side of my rib cage, **the pain is unbearable** and I need to see the doctor/nurse ASAP."

43.     Shortly before noon, Bart was seen by CorrHealth employee Defendant Randall Moon, APRN.

44.    On information and belief, APRN Moon was aware of Bart's February 12th request for medical treatment which gave rise to this appointment, thus APRN Moon knew Bart was complaining of unbearable lung pain.

45.    APRN Moon reviewed RN Dockery's vitals from the day before as well as Bart's diagnoses and current medications, including his antipsychotic medications.

46.    APRN Moon was informed by RN Dockery of the results of her examination of Bart in the clinic the day before, so APRN knew Bart had a complaint of severe lung pain and difficulty breathing. APRN Moon likewise knew that RN Dockery the day before had given Bart Tylenol which had no effect as Bart's pain was still unbearable.

47.    APRN Moon knew of Bart's prescription for antipsychotic medications, and APRN knew Bart had been taking those medications, was overweight, had high blood pressure, and had nephrotic disease.

48.    APRN Moon likewise knew that Bart's medications and each of his medical conditions put Bart at risk of a PE or other VTE and that Bart was presenting with the classic symptoms of a PE.

49.    APRN Moon knew that a PE is a life-threatening emergency.

50.    APRN Moon knew that the only way to confirm or rule out whether Bart had a PE or other VTE was to immediately send him off site for imaging, either a CT or VQ scan, that were not offered on site at the jail but were available at local hospitals.

51.    APRN Moon also knew that it was CorrHealth policy or practice not to send detainees off-site for medical care.

52.    Thus, rather than arrange transport for Bart to be seen at a nearby hospital or other appropriate medical provider, APRN Moon followed CorrHealth policy, administered additional

Tylenol that he knew would be ineffective, and sent Bart back to his cell. APRN Moon did this despite knowing mere Tylenol was the incorrect treatment

53.    The following day, February 13th, Bart again begged Comal County jail staff for medical care and treatment, stating: "My lung still hurts on the right side of my rib cage, especially when I breathe and **the pain is severe (unbearable)**…."

54.    Late that afternoon, Bart was seen by CorrHealth LVN Carla Walker who learned that Bart complained that the pain in his chest was 8 out of 10 on a pain scale, sharp and radiating down his right arm, and that any standing or movement made worse. LVN Walker also determined that Bart still had tachycardia of 115bpm on exam and a respiratory rate of 22 bpm.

55.    On information and belief, CorrHealth LVN Walker was aware of the findings from Bart's visit the day earlier, saw that Bart's heart rate had been 122 bpm, and saw that his respiration rate had also been elevated.

56.    On information and belief, CorrHealth LVN Walker recognized that Bart was exhibiting signs of a medical emergency including sustained tachycardia lasting more than a day, sustained tachypnea lasting more than a day, and uncontrolled pain. She thus knew that Bart needed to be seen by a physician, APRN, or someone with authority to evaluate Bart for emergency or off-site medical care and that Bart was at risk of suffering a medical emergency if she did not.

57.    Despite knowing that she needed to have Bart immediately seen by a physician and that she risked Bart's life and health if she did not, CorrHealth LVN Walker instead treated him incorrectly by giving him only Ibuprofen, despite knowing this would have no effect whatsoever on his tachycardia or tachypnea, or the underlying cause of his tachycardia or tachypnea. She also did not put in any referral to a physician or APRN for review for off-site medical care despite knowing such care was necessary, consistent with CorrHealth policy or practice.

11

58. On February 15th, still in agony, Bart again begged for medical care and treatment, stating: "I would like to have an x-ray taken of my side to see what has been causing the pain." Though both Comal County and RN Dockery both received Bart's February 15th request that same day, Bart did not receive a response from anyone for four days.

59. On February 19th, without even seeing Bart, APRN Moon refused Bart's February 15th request. Instead, he decided Bart would need to just wait it out, despite knowing that this was incorrect in light of Bart's alarming, emergency symptoms.

60. During his daily phone call with his mother, Brenda, on February 19th, Bart told her how hard it was for him to breathe, how weak he was, how he was drenched in a cold sweat, and how he was in terrible pain. He told her how the medical and correctional staff in the jail had been blowing him off, refusing to take his complaints seriously, and refusing to provide him with treatment. Brenda was so worried that she personally called the jail to implore them to care for her son. She stressed to them how sick he was and he was not able to advocate for himself and needed their attention. Tragically, no attention was forthcoming.

61. On February 20th, Bart again desperately begged Comal County and CorrHealth providers for medical care and treatment: "**I've been feeling very sick, I get short of breath and in cold sweat, and get lightheaded within minutes of walking, and it's been interfering with all my daily activities of life for the last 4 days, and <u>it's an emergency</u>**."

62. The symptoms of a PE specifically include: dyspnea (shortness of breath), pleuritic chest discomfort ("lung" pain), tachycardia (elevated heart rate), tachypnea (elevated breathing rate), diaphoresis (sweating) particularly with cool or clammy skin, and weakness—all of which Bart expressed. Bart was correct. He was having a medical emergency that could only be

12

confirmed and treated by off-site medical care and was being consistently ignored rather than provided with that care in the name of saving money.

63. On the evening of February 21st, CorrHealth RN Amy Wolf saw Bart and confirmed that he was short of breath just from moving about his cell. She assessed Bart and found that his pulse was extremely elevated at 143, his respiratory rate was 22, his breathing was shallow, and he had impaired gas exchange—a critical finding requiring immediate treatment and immediate transfer to the hospital for assessment and care.

64. RN Wolf also learned from her colleagues about each of their findings from his visits dating back to February 12, so she knew he his vital signs during this period. RN Wolf therefore knew that Bart's heart rate and respiration rate had both been elevated for several days.

65. Nurse Wolf recognized that Bart's symptoms, in particular his impaired gas exchange, was a medical emergency but she was not able to send Bart out for emergency medical care without an order from a physician or APRN due to Comal County and CorrHealth official policy.

66. CorrHealth RN Wolf called APRN Moon, who did not even come to physically examine Bart. Instead, he unjustifiably only ordered a chest x-ray, which is not diagnostic tool for a PE.

67. APRN Moon only ordered the x-ray because CorrHealth was able to have a portable x-ray brought to the jail rather than send a detainee out for off-site medical care which was more expensive than the on-site x-ray.

68. APRN Moon knew from his own previous evaluation of Bart, his colleagues' findings about Bart, and the nurses' reports to him that Bart had been experiencing an elevated, dangerous heart rate for over a week, an elevated, dangerous respiration rate for over a week, debilitating pain, and now had impaired gas exchange.

69.     APRN Moon knew Bart's disabilities and pre-existing conditions as well as their treatments placed Bart at substantial risk of a PE and that he was actually exhibiting the symptoms of a PE.

70.     APRN Moon actually drew the inference that Bart was at substantial risk of a PE or other VTE based on his history, medications, and symptoms.

71.     APRN Moon also knew that the x-ray would not and could not confirm or rule out a PE but would only delay care to Bart while saving money for CorrHealth. Thus, APRN Moon knew that the x-ray was the incorrect treatment for Bart and served no other purpose than to interfere with the emergency treatment Bart actually needed. Instead, he chose to save money for CorrHealth rather than accommodate and protect Bart.

72.     Sometime on February 21st, Bart once *again* urgently requested medical care and treatment from the Comal County jail and CorrHealth providers: "**I have been feeling sick, within under a minute of standing or walking I get lightheaded, short of breath, and my lungs hurt when I breathe, my appetite is gone.  I think it might be pneumonia and I need an antibiotic. It's an emergency**."

73.     That evening shortly after 8 p.m., the radiologist reading the x-ray reported that the x-ray did not show an acute cardiopulmonary process (like pneumonia) but that follow-up and physical examination were advised.

74.     APRN Moon did not see Bart until late afternoon on February 22nd. Though APRN Moon knew that Bart was still exhibiting symptoms of pulmonary emboli, and needed a further evaluation according to the radiologist, APRN Moon deliberately did neither.

75.     Instead, APRN Moon ordered that Bart be swabbed for Covid and flu. When both tests were negative, APRN Moon ordered that Bart be given Prednisone—a steroid—which is the

absolute last medication that should be ordered for a patient with signs and symptoms consistent with PE. Prednisone *promotes* a state known as hypercoagulability, meaning the blood is more prone to clotting, and it *decreases* the body's natural ability to break down clots, a process called fibrinolysis. By boosting clot formation, hindering clot dissolution, and impairing the function of the cells lining the inside of blood vessels, Prednisone creates an environment for VTE development. In a person already suffering from blood clots in the lungs, it is catastrophic.

76.    APRN Moon recognized that Bart was suffering from symptoms consistent with a PE and that giving Prednisone would make any PE worse, not better.

77.    APRN Moon actually drew the inference that giving Prednisone to Bart without ruling out a PE was life-threatening and incorrect.

78.    Nonetheless, APRN prescribed Prednisone to Bart.

79.    APRN Moon's deliberately incorrect conduct fell wildly below the applicable standard of care for a patient with Bart's symptoms.

80.    Pursuant to this order, CorrHealth employees administered Prednisone to Bart on February 22, 23, and 24th.

81.    By February 24, 2024, Bart could no longer stand or walk on his own. He was pale and weak and sweaty and in agonizing pain. "S", another inmate in the mental health unit alerted staff and insisted that Bart be taken to the medical unit. Bart was put in a wheelchair and wheeled to the medical unit.

82.    In the medical unit shortly before 5 p.m., Bart was seen by CorrHealth RN Katrina Hall. Despite being wheeled to the medical unit (and thus not walking), Bart's pulse was again extremely elevated at 159, his blood pressure had dropped substantially to 96/74 and he was still

15

breathing quickly. His oxygen saturation was also low, indicating the need for immediate emergency medical attention. RN Hall also documented that Bart's skin was cool and pale.

83.    Bart told the nurse it was hard to breathe. RN Hall called APRN Moon and, on information and belief, communicated Bart's concerning vital signs as well as his complaints.

84.    APRN Moon refused to come see Bart in person, though he knew that Bart's continued symptoms, including over a week of tachycardia and tachypnea, shortness of breath, low oxygen saturation, and continued complaints of chest pain were red flags for a PE.

85.    APRN Moon actually recognized that Bart was in danger of suffering from a PE and knew that the only way to confirm or rule out a PE was with off-site medical care, specifically imaging available only at the local hospital and not in the jail.

86.    Nonetheless, APRN Moon followed CorrHealth's cost-cutting policy or practice and once again did not order that Bart be transferred to a hospital or otherwise evaluated.

87.    Instead, he once again gave an order for Bart to just suck it up and wait.

88.    Once again, APRN Moon's intentional misconduct wildly deviated from the standard of care for a patient with Bart's symptoms.

89.    APRN Moon ordered that Bart be taken back to his cell.

90.    Horrifyingly, Bart was returned to his cell where he was laughed at by his jailers, and told he was fine and to stop coming to the medical unit.

91.    After being returned to his cell in the wheelchair, Bart collapsed just a few hours later. Inmate "S" held him up and screamed for help.

92.    By then it was too late. Shortly after Comal County jailers entered Bart's cell, his heart stopped. Resuscitative efforts were unsuccessful.

93.    Bart died late in the evening on February 24, 2024.

16

94.     On autopsy, Bart's cause of death was definitively determined to be the result of pulmonary artery thrombo-embolus due to deep venous thrombosis. Thrombi (blood clots) were present in the left femoral, popliteal and posterior tibial veins and that a large "saddle" thromboembolus straddled his pulmonary trunk (where the main pulmonary artery branches off into a Y-shape to go into each lung).

95.     In other words, the medical examiner found that Bart had suffered multiple pulmonary emboli over the course of days, that APRN Moon actually recognized that Bart was at risk for days earlier, before suffering a large, fatal embolus.

96.     The Travis County Medical Examiner's Office found that Bart's lungs were full of blood and frothy fluid and specifically that his "recent complaints of shortness of breath, chest and arm pain, and lightheadedness in the days prior to death."

97.     As a direct and proximate consequence of Defendants' deliberate indifference and cost-cutting, unconstitutional policies and practices, Bart Bond died an agonizing and painful death at the age of only 33.

**B. Bart's experience was typical in the Comal County Jail and in other jails where CorrHealth provided care.**

98.     At all relevant times, the Comal County Sheriff was Mark W. Reynolds, who first assumed the position in January 2017. Reynolds is and was at all relevant times Comal County's final policymaker for the purposes of law enforcement, including all operations, security functions, and medical functions of the jail.

99.     At all relevant times, the Comal County Judge was Sherman Krause, who served from January 1, 2011 through February 7, 2025.

100.    At all relevant times and since at least 2017, Comal County policymakers including but not limited to Sheriff Reynolds as well as Judge Krause and the county commissioners have made

policy-level decisions to limit detainees' access to medical care in the Comal County Jail, including but not limited to by limiting, delaying, and denying access to off-site medical care to save money.

101.    Pursuant to these policies, APRN Moon and other jail staff and contractors routinely withheld and still withhold emergency services and other off-site medical care to save money.

102.    The County, through its aforementioned policymakers, adopted or approved these policies and practices even though it knew this would endanger detainees and would deny detainees needed care.

103.    Sheriff Reynolds, Judge Krause, and the other County commissioners and officials knew jail staff and the jail's contracted medical staff would regularly encounter detainees suffering from emergent or chronic health conditions that necessitated off-site medical care and that those conditions, if left untreated, posed a substantial risk of serious harm to the detainees.

104.    Comal County—including both Sheriff Reynolds and Judge Krause—further chose to hire CorrHealth as an independent contractor with the purpose and expectation that the contractor would intentionally withhold and delay treatments, and specifically off-site medical care, to avoid the expense of providing qualified care.

105.    CorrHealth routinely received and has received during the relevant time federal funds through programs such as Federal Emergency Management Agency awards.

106.    Comal County pays CorrHealth and has paid CorrHealth during the relevant time for medical services at the jail in part using federal funds. Federal funds received by Comal County are and have been during the relevant time passed on in part to CorrHealth because they are unconstrained and commingled with Comal County's general revenue. The unconstrained funds that are and were passed on to CorrHealth in this manner include, but are not limited to, Social

18

Security Administration Incentive Program funds and Federal Flood Control Receipts.

107. In addition, the Texas legislature disburses and has disbursed during the relevant time billions in non-constrained annual federal financial assistance to local governments. Comal County has received and continues to receive federal funds in that manner through state grants that include federal funds such as from DPS Narcotics grants, Indigent Defense Commission grants, and Auto Theft Task Force grants, and Coronavirus Relief Fund grants. Much of this federal financial assistance to Comal County is and has been during the relevant time used to pay CorrHealth for services at the Comal County jail.

108. On information and belief, the contract entered into by Comal County and CorrHealth in July 2019 and renewed periodically through August 2024 explicitly capped the monthly aggregate cost of all off-site medical care at $25,000 to meet the needs of up to 550 detainees. The contract explicitly encouraged CorrHealth to use "cost cutting" measures and provided that all expenses above $25,000 a month would be borne by CorrHealth, a for-profit business.

109. CorrHealth's policies and practices of delaying and denying medical care and specifically off-site medical care were thus explicitly designed to save the company and the County money.

110. CorrHealth's final policymaker is and was at all relevant times its Chief Executive Officer, Todd Murphy. Consistent with CorrHealth's policies and practices of putting money over people, Mr. Murphy has no medical training. Instead, Mr. Murphy's experience is in business development and sales.

111. CorrHealth has a long history of delaying and denying medical care and specifically off-site medical care to jail detainees, causing severe injuries and death. These injuries and deaths include the following:

19

112. On March 23, 2019, pretrial detainee Dale Erickson died in the Sandoval County Detention Center (New Mexico) of acute hemorrhagic pancreatitis after employees of the jail's medical provider—CorrHealth—delayed and denied necessary medical care to him. Mr. Erickson's family and survivors filed suit in March 2021 against CorrHealth and the jail.

113. CorrHealth was sanctioned in that case for destroying evidence and, after the company continued to refuse to comply with deadlines, misrepresented facts to the court, and willfully delayed trial, the Federal District Court for New Mexico granted a default judgment against CorrHealth for its egregious misconduct in March 2025.

114. In 2021, jailers at the Valencia County Jail (New Mexico) severely beat pretrial detainee Marvin Silva. The employees of the jail's medical provider—CorrHealth—denied him emergency off-site emergency medical care for fractured ribs, a collapsed lung, and injuries to his spleen, head, neck, and abdomen despite recognizing they were obviously necessary for the severely beaten detainee.

115. Instead of providing Mr. Silva with medical care, Valencia County Jail let Mr. Silva go, forcing him to hitchhike home before being taken by ambulance to a hospital.

116. Mr. Silva filed suit against CorrHealth in August 2021.

117. On April 1 2022, Wichita County (Texas) jail detainee Matthew Ray Maxwell died in the jail of a bowel blockage after the employees of the jail's medical provider—CorrHealth—refused to send him off site for emergency medical care for days while he screamed in pain and vomited.

118. On July 31, 2024, Northern District of Texas Court Magistrate Judge David L. Horan recommended denying a motion to dismiss brought by Wichita County, Texas for unconstitutional conditions of confinement arising from the jail's failure to provide emergency or necessary

20

medical care, failure to monitor detainees medical conditions, and cost-cutting efforts specifically including CorrHealth's policy or practice of delaying off-site medical care. On August 15, 2024, Judge Sam A. Lindsey adopted Magistrate Judge Horan's recommendations.

119. Mr. Maxwell's family and survivors filed their lawsuit against CorrHealth on October 6, 2023, months before Bart suffered and died from the same policies and practices that killed Matthew Maxwell in the Wichita County jail.

120. Of course, Comal County's policymakers and CorrHealth's policymakers knew that CorrHealth's policy and practice of cost cutting in the Comal County Jail—explicitly adopted in their contract—had already led to serious detainee injury and death before Bart fell ill.

121. On information and belief, Comal County Jail prisoner Frank Gonzales-Espinoza was denied necessary off-site medical care for days before he ultimately died of a heart condition that CorrHealth was not able to treat inside the jail on March 19, 2018.

122. On February 27, 2022, Comal County detainee Jeannine Harris filed a complaint with the Texas Commission on Jail Standards (TCJS) complaining that CorrHealth employees routinely delayed responding to detainee's medical requests. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

123. On March 21, 2022, Comal County detainee Daniel Niegos filed a similar complaint with TCJS complaining that CorrHealth and the jail had a "culture" of routinely denying detainees' medical requests. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

124. On February 28 and March 23, 2023, Comal County detainee Joseph Burpee filed

21

complaints with TCJS complaining that CorrHealth and jail employees routinely delayed responding to detainee's medical requests. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

125. Less than two weeks after Mr. Burpee's first complaint, on March 13, 2023, Comal County detainee Raymond Mulder also submitted a complaint to TCJS complaining that CorrHealth and jails employees routinely delayed responding to detainee's medical requests. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

126. Just two days later, on March 15, 2023, Comal County Jail detainee Gabriel Vertuecci submitted a complaint to TCJS including documents that showed CorreHealth delayed referring him to a mental health provider for 45 days despite his obvious need for the care.

127. Barely a month later, on April 27, 2023, Comal County detainee Vincent Longigro filed a complaint with TCJS complaining that CorrHealth employees denied him medical care. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

128. On information and belief, on July 11, 2023, Ronald Tracy Bush died of entirely preventable diabetic ketoacidosis after CorrHealth's employees in the Comal County Jail delayed necessary off-site emergency medical care for him for almost a week, despite repeated requests for help.

129. On June 14, 2023 when Mr. Bush was near-death, CorrHealth employees finally allowed Mr. Bush to be taken to a hospital where he was found to be suffering from diabetic ketoacidosis and sepsis and immediately admitted to the intensive care unit. He was placed on a

ventilator the following day, June 15, 2023.

130.    On June 16, 2023, recognizing the expense of Mr. Bush's continued treatment, Comal County and CorrHealth collaborated to have Mr. Bush released from jail so that they would not have to bear the costs of his continued off-site medical care. Mr. Bush never left the ICU and died three weeks later.

131.    On or around August 21, 2023, Comal County jail detainee Robert Montgomery suffered a fractured hand. Though he begged CorrHealth to provide him medical care, they did nothing to help him. On September 11, 2023, when he still had not received care from CorrHealth, Mr. Montgomery submitted a complaint to TCJS that was forwarded to Sheriff Reynolds and CorrHealth who did nothing about the complaint.

132.    On October 6, 2023, Comal County detainee Ricky Lichenstein submitted a written complaint to TCJS complaining that he was denied medical care at the jail on numerous occasions. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

133.    Just days later, on October 10, 2023, Comal County detainee Ersala Jarmon submitted a complaint to TCJS alleging she was denied necessary emergency medical care. On information and belief this emergency care was off-site medical care. On further information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

134.    Two days later, on October 12, 2023, Comal County detainee Joseph Hersha complained to TCJS that he was being denied necessary medical care and, like Bart Bond, receiving only Tylenol for all his complaints. On information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth

23

policymakers who did nothing in response.

135. On October 28, 2023, Comal County Jail detainee Chase Franckowiak complained to TCJS about medical care. On information and belief, these complaints included a denial or delay of necessary off-site medical are by Comal County and CorrHealth. On further information and belief, because a complaint was made to TCJS, the complaint was passed on to the Comal County Sheriff and CorrHealth policymakers who did nothing in response.

136. In September 2023, pregnant detainee Chiree Harley was detained in the Comal County Jail. CorrHealth staff gave her a routine pregnancy test shortly after she was booked and documented that Ms. Harley was pregnant. On November 1, 2023, at just 23 weeks pregnant, Ms. Harley began having contractions and leaking amniotic fluid.

137. Ms. Harley pleaded with detention officers and CorrHealth employees to call and ambulance for days but her requests for off-site emergency care were intentionally delayed and denied for two days.

138. Ms. Harley was not taken to a hospital for two days, but by then it was too late. Ms. Harley's baby was born on November 4, 2023 and lived only twelve hours. That same day, Ms. Harley was released from the jail.

139. On information and belief, Comal County, in collaboration with CorrHealth, arranged to have Ms. Harley released on the day she gave birth and the day her child died so that they would not be responsible for the costs of the off-site medical care and 12-hour NICU stay of Baby Harley.

140. In December 2023, local news KSAT ran a news story on the death of Baby Harley and the intentionally delayed medical care provided to Ms. Harley. KSAT reached out to Comal County Sheriff Reynolds directly for a quote on the story which ran two months before Bart died in the Comal County Jail.

141. Comal County directly received federal funding specifically for services, programs, and goods provided at the Jail pursuant to at least two different grants in effect in 2023 and 2024.

142. Comal County paid CorrHealth during the relevant time for medical services at the jail using, in part, these federal funds.

143. In addition, the Texas legislature disburses and has disbursed during the relevant time billions in non-constrained annual federal financial assistance to local governments. Comal County has received and continues to receive federal funds in that manner through state grants that include federal funds such as from County Transportation Infrastructure Fund grants, Local Emergency Planning Committee grants, Indigent Defense Commission grants, EMS Trauma Fund grants, and Coronavirus Relief Fund grants. Much of this federal financial assistance to Comal County was used to pay CorrHealth for services at the Comal County jail during the relevant time.

144. CorrHealth cuts costs by failing to provide adequate care for inmates and avoiding sending detainees to off-site emergency rooms, hospitals, or physicians, just as its employee, APRN Moon, did for Bart. At all relevant times CorrHealth expected its employees to routinely gamble on the possibility that a detainee who needed immediate care would survive long enough to be released so that the county will not be liable for the cost of outside treatment, despite the known risk that inmates' condition will deteriorate and they suffer pain and preventable death, as happened with Bart.

145. CorrHealth's agreement with the County—which was between the final policymakers for each entity, Krause and Reynolds for the County and Murphy for CorrHealth—was specifically designed to incentivize CorrHealth not to approve transport of detainees to receive outside treatment, as the contract explicitly placed a cap on outside care and required CorrHealth, a for-profit entity, to choose to give up its own profits to pay for care above the cap.

25

146.   CorrHealth's strategies for cutting costs were well-known to its policymaker and widespread not only in the Comal County Jail but in other jails where CorrHealth operated.

147.   The final policymakers for Comal County and CorrHealth were well aware of CorrHealth's track record and reputation for allowing inmates to be seriously injured or die from neglect and refusal to provide adequate medical care.

148.   CorrHealth's and Comal County's policies and practices proximately caused and were the moving force of APRN Moon's misconduct in Bart's care, the denial of care throughout Bart's ordeal with correctional and medical staff, and the discrimination Bart faced from correctional and medical staff in accessing urgently necessary medical care.

## V. CAUSES OF ACTION

### A.    42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
(Plaintiff's *Monell* Claim Against Comal County)

149.   At the time of the incident, Comal County had the following policies and practices forming conditions of confinement at the jail—all of which were known to County policymakers, which were adopted with deliberate indifference to the well-being and constitutional rights or its detainees, and which were the moving force of Mr. Bart's suffering, injuries, and death:

   a.    Denying adequate medical care to detainees;

   b.    Denying off-site medical care to detainees;

   c.    Denying necessary off-site medical care to detainees in order to save money;

   d.    Delaying detainees' access to medical care;

   e.    Delaying off-site medical care to detainees;

   f.    Delaying off-site medical care to detainees in order to save money;

   g.    Underfunding health care at the jail, proximately causing denials and delays of care;

   h.    Hiring Defendant CorrHealth PLLC using a contractual arrangement which was designed to effectuate the foregoing dangerous conditions of confinement;

i.      Hiring Defendant CorrHealth PLLC despite actually knowing it was the policy or practice of CorrHealth to deny necessary off-site medical care to detainees; and

j.      Hiring Defendant CorrHealth PLLC despite actually knowing it was the policy or practice of CorrHealth to deny necessary off-site medical care to detainees specifically in order to save money.

150.    These conditions were sufficiently well known and pervasive to constitute policymakers' intended conditions of confinement, policies, and practices at the Comal County Jail.

151.    The Sheriff, County Judge, and other policymakers personally approved and enacted these official policies when they entered into the contract with CorrHealth to effectuate them as described above.

152.    These practices and conditions had no legitimate penological purpose, were adopted with deliberate indifference to the health and safety of Comal County detainees, and were actually known, constructively known, and/or ratified by Comal County and its policymakers (including the Sheriff, County Judge, and Commissioners).

153.    Moreover, the known and obvious consequence of these conditions, policies, and practices was that Comal County jail staff and contractors including CorrHealth would be placed in recurring situations in which the constitutional violations described within this complaint would result. Specifically, Comal County knew CorrHealth providers like APRN Moon would refuse to provide detainees with access to necessary off-site medical care, despite a substantial risk of serious harm, to save money, just as happened to Bart and other CorrHealth patients discussed above. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

154.    These conditions of confinement were the result of deliberate choices made by County policymakers, including the Sheriff, despite the obvious danger to detainees housed inside the jail.

Policymakers at the jail knew of these dangerous policies and conditions of confinement but failed to protect detainees from them.

155.   The jail's system for providing inmates access to medical care and in particular necessary off-site medical care was known by County policymakers to be wholly inadequate to treat detainees with serious, medical and psychiatric conditions that required off-site care.

156.   The County's deliberate indifference to the serious medical needs of its prisoners in the jail, like Bart, caused him to needlessly suffer and die.

157.   Moreover, each of these condition, policies, and practices, as well as the specific actions of the individual Defendants, were known to the Sheriff and approved or ratified, either tacitly or directly, by the Sheriff.

158.   Despite these known and obvious problems, County policymakers did nothing to protect the rights of prisoners in the jail or to remedy the dangerous conditions.

159.   As a direct result and proximate cause of the foregoing, Bart suffered agonizing pain and died due to the deprivations of his Fourteenth Amendment rights.

### B.     42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
(As to Defendants CorrHealth and APRN Randall Moon)

160.   Plaintiff brings suit against Defendant CorrHealth and APRN Moon pursuant to 42 U.S.C. § 1983, for violating Bart Bond's Fourteenth Amendment right to receive medical care and be provided access to medical care as a pre-trial detainee.

161.   Defendant APRN Moon subjectively knew that Bart was suffering an objectively serious medical problem and experiencing obvious symptoms including progressively worsening pain, tachycardia, tachypnea, and difficulty breathing. APRN Moon knew these were signs of a PE or other VTE that CorrHealth and the Comal County jail were incapable of diagnosing and treating on-site. APRN also knew of Bart's specific disabilities, conditions, and medications that

28

placed him at substantially higher risk than even the already at-risk general jail population including being overweight, being on antipsychotic medications, having high blood pressure, and having nephrotic syndrome.

162.   Defendant APRN Moon knew that Bart was not being treated correctly in the jail and that he needed to be taken to an emergency room, hospital, or other facility capable of providing imaging to confirm or rule out a dangerous VTE, but he delayed and denied Bart access to off-site medical care. Despite his actual knowledge, APRN Moon delayed providing Bart medical care he knew Bart needed, and refused Bart timely access to necessary off-site medical care, even though APRN Moon knew this medical care was immediately necessary to prevent serious harm to Bart.

163.   Defendant APRN Moon personally declined to seek or authorize necessary medical care for Bart, delaying his care for weeks until Bart died, despite actual knowledge of his serious and time sensitive medical need. APRN Moon actually learned of Bart's worsening condition by personally observing it on several occasions when he evaluated Bart and when he received direct reports of it by phone from the nurses under his supervision. Despite this knowledge, APRN Moon chose to treat Bart incorrectly by prescribing only Tylenol and ordering an x-ray though he knew both would be ineffective at treating or diagnosing Bart's potential PE or other VTE.

164.   As a direct and proximate consequence of Defendant APRN Moon's deliberate indifference, Bart Bond suffered agonizing pain and ultimately died.

165.   Defendant CorrHealth is vicariously liable for APRN Moon's above-described misconduct, as all of those actions occurred in the course and scope of Moon's employment by CorrHealth.

166.    Likewise, CorrHealth is vicariously liable for all of the other medical providers it employed who, as described above, deliberately denied Bart Bond the care he needed and whose actions described above were a proximate cause of Bond's suffering and death.

### C.    42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
(Plaintiff's *Monell* Claim Against CorrHealth)

167.    While Plaintiff is not required to plead or prove a claim under *Monell* in order for CorrHealth to be liable, out of an abundance of caution, Plaintiff additionally pleads the following:

168.    At the time of the incident, CorrHealth had the following policies and practices—all of which were known to CorrHealth's policymakers including its CEO Murphy, which were adopted with deliberate indifference to the well-being and constitutional rights or its detainees, and which were the moving force of Bart Bond's injuries, death, and the constitutional injuries he suffered:

a.    Capping the aggregate monthly cost of all off-site medical care for approximately 550 detainees at $25,000, despite knowing this would be insufficient for the individual detainees' needs for off-site medical care;

b.    Denying adequate medical care to detainees;

c.    Denying off-site medical care to detainees;

d.    Denying necessary off-site medical care to detainees in order to save money;

e.    Delaying detainees' access to medical care;

f.    Delaying off-site medical care to detainees;

g.    Delaying off-site medical care to detainees in order to save money; and

h.    Underfunding health care at the jail, proximately causing denials and delays of care.

169.    These conditions were sufficiently well known and pervasive to constitute CorrHealth policymakers' intended conditions and practices at the Comal County Jail.

170. These practices and conditions had no legitimate penological purpose, were adopted with deliberate indifference to the health and safety of Comal County inmates, and were actually known, constructively known, and/or ratified by CorrHealth and its policymakers.

171. Moreover, the known and obvious consequence of these policies was that CorrHealth medical staff at the Comal County jail, including APRN Moon, would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

172. These conditions of confinement were the result of deliberate choices made by CorrHealth policymakers despite the obvious danger to detainees housed inside the jail. CorrHealth policymakers, including its CEO Murphy, knew of these dangerous policies and conditions of confinement but failed to protect detainees from them.

173. CorrHealth's system for providing detainees access to medical care was known by CorreHealth. policymakers to be wholly inadequate to treat detainees with serious medical and psychiatric conditions as well as those who were at risk of suffering medical emergencies, which is to say, all of the detainees in the Comal County Jail.

174. CorrHealth's deliberate indifference to the serious medical needs of its prisoners in the jail, like Bart, caused him to needlessly suffer and die.

175. Moreover, each of these policies and practices, as well as the actions of APRN Moon, were known to the corporate final policymakers for CorrHealth, including CEO Murphy, and approved or ratified, either tacitly or directly, by them.

176. Despite these known and obvious problems, CorrHealth policymakers did nothing to protect the rights of prisoners in the jail or to remedy the dangerous conditions.

177. As a direct result and proximate cause of the foregoing, APRN Moon decided to repeatedly refuse Bart off-site medical care, as described above, because he was following CorrHealth official policy. This directly and proximately caused Bart Bond to suffer pain and died due to the deprivations of his Fourteenth Amendment rights, causing Plaintiff's damages.

### D. AMERICANS WITH DISABILITIES ACT & REHABILITATION ACT
(as to Comal County and CorrHealth under the Rehab Act, Comal County under the ADA)

178. Plaintiff incorporates by reference all of the foregoing as if fully restated herein and further alleges as follows:

179. Comal County and CorrHealth were, at all relevant times, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental disabilities in their facilities, programs, activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794.

180. Further, Title II of the ADA applies to Comal County, a public entity, and has the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq*.

181. The Comal County Jail is a facility, and its operations comprise programs and services, for Rehabilitation Act and ADA purposes. The services and programs provided by CorrHealth in the Comal County Jail are likewise programs and services for Rehabilitation Act purposes.

182. Randall Moon, the Comal County jailers and other Comal County staff intentionally discriminated against Bart solely because of his disability by denying him access to necessary medical attention while he was involuntarily confined as a pretrial detainee in the Comal County Jail mental health unit.

183. Randall Moon subjectively knew, and it was obvious, that Bart needed immediate access to medical attention off-site from the Comal County jail—including, but not limited to,

32

intravenous fluids, intravenous anticoagulation, intravenous medical intervention, and transport to a hospital where he could receive the appropriate higher level of medical care such as thrombolytic drugs.

184.    Despite knowing Bart needed off-site transport for these medical services, Randall Moon not only failed to provide transport and all of those medical services, but expressly ordered a medication that would worsen Bart's condition exponentially due to his disability.

185.    Thus, Randall Moon intentionally treated Bart incorrectly and refused to treat Bart solely because of his disability.

186.    Furthermore, APRN Moon, Comal County jailers, and other CorrHealth staff also displayed animus for Bart due to his disability and falsely discounted the severity of his pain due to malice for Bart's mental health conditions. As a result of this animus, they denied him access to off-site medical services that they knew he needed to survive.

187.    As a direct and proximate result, Bart suffered and died.

188.    Randall Moon was at least deliberately indifferent to the substantial risk of serious harm to Bart when he refused to treat Bart, intentionally treated Bart incorrectly, denied him medical care, and delayed his access to necessary medical attention.

189.    The Comal County jail is a facility and its operations comprise programs and services for Rehabilitation Act purposes.

190.    Safe housing, a safe treatment environment, medical care, food services, fluids, and mental health care are among the programs and services the Comal County jail provided to people for which Bart was otherwise qualified.

191.    For the purposes of the Rehabilitation Act, Bart Bond was a qualified individual with a disability —autism— that substantially limited one or more of his major life activities or the

operation of one or more of his major bodily systems. Specifically, Bart's autism impaired the operation of his brain, and substantially limited his impulse control, enjoyment of life, participation in medical decisions, as well as his ability to think, perceive reality, sleep, communicate, and care for himself, as described above. *See* 42 U.S.C. § 12102(1)–(2).

192. Comal County jailers knew that Bart was a person with a disability. Comal County jailers knew his mental illness had required previous psychiatric treatment and currently required detention in the mental health unit in the first place.

193. The Comal County jail further regarded Bart as disabled for purposes of the Rehabilitation Act because his jailers laughed at Bart for repeatedly asking to go to the medical unit and accusing his symptoms of being "in his head".

194. Despite actual knowledge of Bart's disabilities and his need for accommodations, agents of the Comal County jail intentionally discriminated against Bart solely due to his disabilities under the meaning of the Rehabilitation Act by purposefully denying him medical care due to subjective discriminatory animus and actual malice towards Bart. Despite knowing Bart was not faking, CorrHealth deliberately directed staff to return Bart to his cell to save those "precious tax dollars."

195. The Comal County jail also regarded him as disabled and intentionally discriminated against Bart based on the perception that his repeated requests for medical attention were the result of obsessive Asperger's behaviors or psychotic schizophrenia behaviors which were, in turn, symptomatic of Bart's disabilities or what Randall Moon and staff regarded as his disabilities.

196. Furthermore, CorrHealth and Comal County intentionally discriminated against Bart by denying him reasonable accommodations, including (a) medical attention, (b) a higher level of medical care, and (c) transport to a hospital for actual treatment. Furthermore, the need for these

accommodations was obvious and actually known to the medical staff, who considered but then refused to provide them until it was too late.

197.    By denying Bart these reasonable accommodations for his disabilities or perceived disabilities, Bart was denied access to safe housing, a safe treatment environment, medical care, and the mental health unit provided to other detainees.

198.    Thus, the Comal County jail and CorrHealth failed and refused to reasonably accommodate Bart's mental disabilities while he was in the jail's custody in violation of the Rehabilitation Act. That intentional failure and refusal proximately caused his death.

199.    As Bart died as a direct and proximate result of Comal County jail's and CorrHealth's intentional discrimination against him, Plaintiff is entitled to compensatory damages against Comal County and CorrHealth.

### E.    NEGLIGENCE
(as to Defendant CorrHealth and APRN Moon)

200.    At the time of the healthcare made the basis of this lawsuit, APRN Moon, other nursing staff, administrative staff, and other healthcare providers involved in the care of Bart Bond were employees or agents of CorrHealth, working within the course and scope of their employment with CorrHealth. As such, CorrHealth is responsible for all of these employees' acts and/or omissions under the theory of *respondeat superior* and vicarious liability, as their conduct fell far below and wildly violated the standard of care.

201.    APRN Moon is liable for his own misconduct and CorrHealth is vicariously liable for its employees' breaches of the applicable standard of care under Texas law. APRN Moon as well as CorrHealth's employees mistreated Bart Bond and widlly deviated from the standard of care, including, but not limited to, in the following:

    a.  APRN Moon and other CorrHealth medical staff failed to order Bart be timely

transferred to the hospital setting for emergent care for pulmonary emboli;

b. APRN Moon and other CorrHealth medical staff failed to order testing to rule pulmonary embolism in or out of the differential. Blood work, to include D-dimer, was not done, and a chest x-ray to rule out pneumonia was not done until February 21st. A chest x-ray is not diagnostic for PE, and Bart required CT angiography to rule PE in or out.

c. APRN Moon and other CorrHealth medical staff ordered Prednisone for a patient who was experiencing VTE, which is a gross breach of the standard of care.

d. Administrative staff and nursing staff—as part of the multi-disciplinary team— failed to advocate for Bart when APRN Moon consistently downplayed the seriousness of his illness.

e. APRN Moon and other CorrHealth nursing staff failed to escalate Bart's care and use the chain of command even when it was known that the jail was not a safe place for this patient to be;

f. APRN Moon and other CorrHealth nursing staff failed to communicate Bart's condition to a physician(s); and

g. APRN Moon and other CorrHealth staff failed to properly and timely render appropriate care to Bart.

202. Each of the foregoing acts and omissions by APRN Moon and other CorrHealth staff was performed with a degree of culpability which far exceeded negligence and appears to have been calculated to intentionally treat Bart Bond incorrectly for the purpose of saving CorrHealth (or perhaps Comal County) money, if not for the very purpose of causing Bart Bond harm due to the symptoms of his disability or simple malice against him for his disability. At the very least, all of these acts and omissions breached APRN Moon and other CorrHealth medical staff's duty to act as an ordinarily prudent medical provider would act under the same or similar circumstances.

203. Each of the foregoing acts and omissions by APRN Moon and other CorrHealth staff were a proximate cause of Bart Bond's death and the damages sought herein by Plaintiff. In reasonable medical probability, but for the misconduct of APRN Moon and CorrHealth, Bart would not have died.

204. APRN Moon further was subjectively aware of an extreme risk of serious harm to Bart Bond from his foregoing conduct.

205. CorrHealth's vice-principals were likewise subjectively aware of an extreme risk of serious harm that would result from the policies that APRN Moon followed of restricting off-site medical transports despite obvious serious medical needs to save money.

206. CorrHealth's vice-principals were aware that those same policies had caused serious harm in the past as described above.

207. Nonetheless, CorrHealth's vice-principals did nothing to stop those polices' dangerous applications and continued to preside over a dangerous practice, proximately caused Bart's mistreatment and death.

208. Due to the egregious nature of their conduct which included actual malice, and the fact that APRN Moon acted as the direct and foreseeable result of CorrHealth official policy, Plaintiff is entitled to punitive damages against APRN Moon and CorrHealth only.

## V.   DAMAGES

209. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

210. Defendants deprived Bart Bond of his civil rights under the United States Constitution and under federal law. Moreover, these acts and omissions by the Defendants, their agents, employees, and/or representatives proximately caused and/or were a moving force of the injuries and damages to the Plaintiff, and those same acts and/or omissions proximately caused and/or were a moving force of Mr. Bond's wrongful death. Accordingly, Plaintiff asserts claims under the Americans with Disabilities Act, Rehabilitation Act, 42 U.S.C. § 1983, and the Texas wrongful death and survivorship statutes.

211.    Plaintiff, Brenda Bond, in her capacity as statutory heir asserting survival claims on behalf of the Estate of Bart Bond, has incurred damages including, but not limited to, the following:

   a.   Physical pain and mental anguish suffered by Bart Bond prior to his death;

   b.   Punitive damages as to APRN Moon and CorrHealth only;

   c.   Any other costs incurred by the Estate as a result of Defendants' deliberate indifference and/or misconduct; and

   d.   Funeral and burial expenses.

212.    Plaintiff, Brenda Bond in her individual capacity asserting wrongful death claims, has incurred damages, including but not limited to, the following:

   a.   Past and future mental anguish;

   b.   Past and future loss of companionship and society;

   c.   Past and future medical expenses;

   d.   Punitive damages as to APRN Moon and CorrHealth; and,

   e.   Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value; and

   f.   attorneys' fees, expenses (including expert expenses), and costs pursuant to 42 U.S.C. § 1988, the 42 U.S.C. § 12205, or as otherwise allowed by law.

## VIII. ATTORNEYS' FEES

213.    Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees, costs, and expenses against all Defendants as to the 42 U.S.C. § 1983 claims. Additionally, pursuant to 42 U.S.C. § 12205, Plaintiff is entitled to recover attorneys' fees, costs, and expenses (including expert expenses) against Defendants Comal County and CorrHealth as to the ADA and Rehabilitation Act claims.

### IX.    JURY DEMAND

214.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a jury trial.

### X.    PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that judgment be awarded against Defendants pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 12133, and 29 U.S.C. § 794a:

a.  Award compensatory damages against all Defendants, jointly and severally;

b.  Find that Plaintiff is the prevailing party in this case and award attorney's fees, including reasonable and necessary expenses such as expert fees, pursuant to 42 U.S.C § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b);

c.  costs of court;

d.  prejudgment and post-judgment interest at the highest rate allowable under the law; and

e.  all other relief to which Plaintiff is justly entitled.

Date: February 11, 2026.

Respectfully submitted,

**MARYNELL MALONEY LAW FIRM, PLLC**
102 Wickers Street
San Antonio, Texas 78210
Telephone: (210) 212-8000
Facsimile: (210) 212-8385

By:  /s/ Michelle M. Maloney
MICHELLE M. MALONEY
State Bar No. 24069099
michelle@marynellmaloneylawfirm.com
CHRIS HERNANDEZ
State Bar No. 24069098
chris@marynellmaloneylawfirm.com

**EDWARDS LAW**
603 W. 17TH ST.
AUSTIN, TX 78701
Tel. 512-623-7727
Fax. 512-623-7729

By  /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
MIKE SINGLEY
State Bar No. 00794642
mike@edwards-law.com
LISA SNEAD
State Bar. No. 24062204
lisa@edwards-law.com
DAVID JAMES
State Bar No. 24092572
david@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**